United States District Court
Southern District of Texas
**ENTERED**
February 09, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREDDIE MITCHELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civ. A. H-14-2784 |
| | § | |
| ENERGY TRANSFER PARTNERS, LP, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT

The First Amended Complaint (instrument #7) in the above referenced case alleges racial discrimination leading to Plaintiff Freddie Mitchell's ("Mitchell's") purported termination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and in violation of the Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code Ann. §§ 21.001-21.556,[1] and violations of the Family and Medical Leave Act (the "FMLA"), 42 U.S.C. § 2000e, *et seq.*, following Mitchell's return from authorized leave under the FMLA, and seeking re-employment, compensatory damages, costs including attorneys' fees, and other relief to which he may be entitled.  Pending before the

---

[1] The popular name for Chapter 21 of the Texas Labor Code is the Texas Commission on Human Rights Act or TCHRA.  Texas abolished the Texas Commission on Human Rights in March 2004 and transferred its duties to the Texas Workforce Commission. Although the Texas Supreme Court stated it would not use the earlier name, the popular name is still used by many courts. *Little v. Texas Dept. of Criminal Justice*, 148 S.W. 3d 374, 377-78 (Texas 2004); *ATI Enterprises, Inc. v. Din*, 413 S.W. 3d 247, 249 n.3 (Tex. App.--Dallas 2013).

Court is Defendant Energy Transfer Partners, L.P.'s ("Energy's")[2] motion for summary judgment (instrument #17).

In his opposition (#19) to the motion for summary judgment, Mitchell states that "[a]fter conducting discovery, Plaintiff has decided to no longer pursue the FMLA claims."  #19, p.6, n.1.  Therefore the Court dismisses Mitchell's claims under the FMLA with prejudice and does not otherwise address them here.

### Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] Energy states several times in footnotes in the pleadings that it did not employ Mitchell at any time, that it is incorrectly named as a Defendant in this suit, and that instead, at all times relevant to this suit, Mitchell was employed by La Grange Acquisition, L.P.  Because Energy has not moved to dismiss itself or for summary judgment, but has voluntarily remained in this suit and defended against Mitchell's claims, the Court assumes Energy has abandoned this defense, and it treats Energy as the proper Defendant.  Furthermore, Exhibit 4 to Mitchell's opposition (#19-4) to the motion for summary judgment, an internal document of Energy, indicates that Mitchell was hired by "Energy Transfer Company, (Our Midstream and Transportation Business), a wholly owned affiliate of Energy Transfer Partners, L.P."

Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which the nonmovant bears the burden of proof at trial; a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991). The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for

trial." *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

### Relevant Law

Under § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(1) and (2), it is "an unlawful employment action for an employer . . . (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin."

Pursuant to the statute, suit may be brought under two distinct theories of discrimination, disparate treatment and disparate impact. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977); *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006), *cert. denied*, 549 U.S. 888 (2006). Title VII expressly prohibits both (1) intentional discrimination based on race, color, religion, sex or national origin, known as

"disparate treatment," as well as (2) an employer's facially neutral practices that are discriminatory in operation against protected groups (race, color, religion, sex or national origin) and not required by the nature of the job, known as "disparate impact". 42 U.S.C. §§ 2000e-2(a)(1) and 2000e(k)(1)(A); *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672-73 (2009); *Pacheco*, 448 F.3d at 787. The instant suit is one for disparate treatment, which requires proof of discriminatory motive. *Pacheco*, 448 F.3d at 787.

A plaintiff may establish a claim of discrimination under Title VII by presenting direct evidence or by using the indirect method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This suit falls in the latter category.

Under the *McDonnell Douglas* framework applied to circumstantial evidence cases, a plaintiff must first make a *prima facie* case of employment discrimination. To establish a *prima facie* case of intentional discrimination under a disparate treatment theory Plaintiff must demonstrate that he "(1) is a member of a protected class (Mitchell is African American); (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

An "adverse employment action for Title VII
discrimination claims based on race, color, religion, sex, or
national origin "'include[s] only ultimate employment decisions
such as hiring, granting leave, discharging, promoting, or
compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559
(5th Cir. 2007), *quoting Green v. Administrator of Tulane Educ.
Fund*, 284 F.3d 641, 657 (5th Cir. 2002). "Title VII was only
designed to address '*ultimate* employment decisions, not to
address every decision made by employers that arguably might have
some tangential effect upon those ultimate decisions.'" *Burger
v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 878 (5th Cir.
1999)(emphasis in original), *quoting Mattern v. Eastman Kodak
Co.*, 104 F.3d 702, 707 (5th Cir.), *cert. denied*, 522 U.S. 932
(1997),(*abrogated on other grounds by Burlington Northern and
Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). If an employer's
action fails to have more than a "mere tangential effect on a
possible future ultimate employment decision," it does not
constitute an adverse employment action. *Mattern,* 104 F.3d at
708. To be actionable, an adverse employment decision must be a
"tangible employment action that constitutes a significant change
in employment status, such as hiring, firing, failing to promote,
reassignment with significantly different responsibilities, or a
decision causing a significant change in benefits." *Burlington
Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998).

"[A] decision made by an employer that only limits an
employee's opportunities for promotion or lateral transfer does
not qualify as an adverse employment action under Title VII."

*Banks v. East Baton Rouge Parish School Board*, 320 F.3d 570, 575
(5th Cir. 2003), *citing Burger*, 168 F.3d at 878-80 (holding that
an employer's refusal of an employee's request for a "purely
lateral transfer" does not qualify as an adverse employment
action under Title VII). *See also Dollis v. Rubin*, 77 F.3d 777,
781-82 (5th Cir. 1995)(affirming decision that an employer's
denial of a "desk audit" to a female employee is not an adverse
personnel action under Title VII, even though the employee
claimed that the decision restricted her "promotional
opportunities"), *overruled in part on other grounds in
retaliation cases only*, *Burlington N. and Santa Fe Ry. v. White
(hereinafter "Burlington N.")*, 548 U.S. 53 (2006)(rejecting
limiting actionable retaliation claims to ultimate employment
decisions and redefining adverse employment action in retaliation
context as any action that might have dissuaded a reasonable
worker from making or supporting a charge of discrimination).  By
themselves, documented reprimands, though potentially affecting
future employment decisions, do not qualify as adverse employment
decisions. *Thompson v. Exxon Mobil Corp*., 344 F. Supp. 2d 971,
981 (E.D. Tex. 2004), *citing Felton v. Polles*, 315 F.3d 470, 487
(5th Cir. 2002)(*abrogated on other grounds in retaliation cases
only by Burlington N.*), and *Raggs v. Mississippi Power & Light
Co.*, 278 F.3d 463, 470 (5th Cir. 2002).  The same is true of
negative performance evaluations, even if they were not deserved.
*Thompson*, 344 F. Supp. 2d at 981 (and cases cited therein).
Disciplinary write-ups also fail to qualify as adverse employment
actions.  *Id.* at 982, *citing Mattern*, 104 F.3d at 707, and

*Carthon v. Johnson Controls, Inc.*, 100 Fed. Appx. 993, 997 (5th Cir. 2004)(The employee's "receipt of a single disciplinary warning--without an attendant change in the terms or conditions of his employment--does not qualify as an ultimate employment decision."). *See also Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000)(employer's decision to  take away a big account from an employee after she filed an EEOC complaint did not constitute an adverse employment action even though it decreased her chances of advancement); *Davis v. Miss. Transp. Commission*, 618 F. Supp. 2d 559, 564 (S.D. Miss. 2009)("[W]e have repeatedly held that an employment action that limits an employee's future opportunities for promotion, but does not affect the employee's job duties, compensation, or benefits, does not qualify as an adverse employment action.").

For the fourth prong, "similarly situated" employees are employees who are treated more favorably in "nearly identical" circumstances[3]; the Fifth Circuit defines "similarly

_____

[3] *See Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009), discussing "similarly situated" employees:

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not been deemed similarly situated.  Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated.  This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances."  The employment actions being

situated" narrowly.  *Silva v. Chertoff*, 512 F. Supp. 2d 792, 803
n.33 (W.D. Tex. 2007).[4]  Similarly situated individuals must be

> compared will be deemed to have been taken
> under nearly identical circumstances when the
> employees being compared held the same job or
> responsibilities, shared the same supervisor
> or had their employment status determined by
> the same person, and have essentially
> comparable violation histories.  And,
> critically, the plaintiff's conduct that drew
> the adverse employment decision must have
> been "nearly identical" to that of the
> proffered comparator who allegedly drew
> dissimilar employment decisions.  If the
> "difference between the plaintiff's conduct
> and that of those alleged to be similarly
> situated *accounts for* the difference in
> treatment received from the employer," the
> employees are not similarly situated for the
> purposes of employment discrimination
> analysis.  [footnotes omitted]

[4] District Court Judge Montalvo in *Silva* listed the
following examples in n.33:

> *Wheeler [v. BL Dev. Corp.*, 415 F.3d 399, 406
> (5th Cir. 2005)], (finding insufficiently
> identical circumstances where the terminated
> white plaintiff and a black manager who
> remained employed had the same supervisor,
> were both company directors, and were both
> accused of removing company assets at
> relatively the same time; the Court of
> Appeals noted that the white plaintiff lied
> repeatedly during the course of the company's
> investigation, while the black employee
> admitted her actions; in addition, the value
> of the property the black employee removed
> was "dramatically less" than the property the
> white plaintiff removed); *Mayberry [v. Vought
> Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.
> 1995)](finding that the plaintiff had not
> shown "nearly identical" circumstances merely
> because he produced evidence that white and
> black employees in the same position had
> scrapped parts due to the employer's operator
> error or poor workmanship, but were not
> disciplined; the plaintiff had not shown that
> the undisciplined employees had, like him, a
> history of poor work performance and scrapped

"nearly identical" and must fall outside the plaintiff's protective class. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir.), *cert. denied*, 546 U.S. 1061 (2005). Where different decision makers or supervisors are involved, their decisions are rarely "similarly situated" in relevant ways for establishing a *prima facie* case. *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971 (E.D. Tex. 2004), *citing Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) for the proposition that "[a] demonstration of substantial similarity generally requires a showing that a common supervisor was involved in the decision

---

parts damage amounting to $8,000); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991)(concluding that the plaintiff had not shown "nearly identical" circumstances because the employee outside the plaintiff's protected class who allegedly received more favorable treatment did not have the same supervisor); *Smith v. Wal-Mart Stores (no. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990)(determining that the plaintiff and the employee outside her protected class who allegedly received preferential treatment were not similarly situated where the employer discharged the plaintiff because the plaintiff violated its non-fraternization policy and the other employee's conduct did not involve the employer's non-fraternization policy). "[P]ut another way, the conduct [or circumstances] at issue is not nearly identical when the difference between the plaintiff's conduct [or circumstances] and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000)(finding that the "striking differences" between the plaintiff's and purportedly similarly situated employee outside the plaintiffs' protected class "more than account[ed] for the different treatment they received.").

making"). *See also Perez v. Texas Dep't of Criminal Justice,
Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004)("We . . . have
explained consistently that for employees to be similarly
situated those employees' circumstances, including their
misconduct, must have been 'nearly identical.'"); *Hockman v.
Westward Communications, LLC*, 282 F. Supp. 2d 512, 527-28 (E.D.
Tex. 2003)("The 'nearly identical' standard, when applied at the
*McDonnell Douglas* pretext stage, is a stringent standard--
employees with different responsibilities, different supervisors,
different capabilities, different work rule violations or
different disciplinary records are not considered to be 'nearly
identical.'"), *citing Okoye v. Univ. of Tex. Houston Health
Science Center*, 245 F.3d 507, 514 (5th Cir. 2001)(Employees are
not in nearly identical circumstances when their actions were
reviewed by different supervisors; "to establish disparate
treatment a plaintiff must show that the employer 'gave
preferential treatment to [] [another] employee under 'nearly
identical' circumstances' . . .; that is "the misconduct for
which [plaintiff] was discharged was nearly identical to that
engaged in by . . . [other] employee[s].'").

        Nevertheless, in *Lee v. Kansas City Southern Ry. Co.*,
574 F.3d 253, 260-61 (5th Cir. 2009), a Fifth Circuit panel
opined,

> We do not, however, interpret "nearly
> identical" as synonymous with "identical."
> Applied to the broader circumstances of a
> plaintiff's employment and that of his
> proffered comparator, a requirement of
> complete or total identity rather than near
> identity would be essentially

insurmountable, as it would only be in the
rarest of circumstances that the situations
of two employees would be totally identical.
For example, it is sufficient that the
ultimate decisionmaker as to employees'
continued employment is the same individual,
even if the employees do not share an
immediate supervisor. Each employee's track
record at the company need not comprise the
identical number of identical infractions,
albeit these records must be comparable. As
the Supreme Court has instructed, the
similitude of employee violations may turn
on the "comparable seriousness" of the
offense for which discipline is meted out
and not necessarily on how a company codes
an infraction under its rules and
regulations. Otherwise, an employer could
avoid liability for discriminatory practices
simply by coding one employee's violation
differently from another's.

*Quoted by Turner v. Kansas City Southern Ry. Co.*, 675 F.3d 887,
893 (5th Cir. 2012); *Roberts v. Lubrizol Corp.*, 582 Fed. Appx.
455, 459 (5th Cir. Sept. 24, 2014).

If the plaintiff makes a *prima facie* case, there is a
presumption of discrimination, and the burden of production then
shifts to the employer to provide a legitimate, non-
discriminatory reason for the adverse employment action. *Chevron
Phillips*, 570 F.3d at 615.

If the employer meets this burden, the presumption of
discrimination disappears and the plaintiff bears the ultimate
burden of persuading the trier of fact by a preponderance of the
evidence that the defendant intentionally discriminated against
the plaintiff because of her protected status. *Wallace v.
Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). To do
so, the plaintiff must produce substantial evidence showing that

the proffered legitimate nondiscriminatory reason is a pretext for discrimination. *Reeves*, 530 U.S. at 143. "Evidence is 'substantial' if it is 'of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2004). Plaintiff may use either of two methods to rebut each of the nondiscriminatory reasons articulated by the employer: pretext or mixed motive. *Rachid v. Jack in The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

For pretext, the plaintiff must show that the defendant's proffered explanation is false or "unworthy of credence." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2004), *citing Wallace*, 271 F.3d at 221. One way is to show that the employer treated plaintiff more harshly that other "similar situated employees" for "nearly identical conduct," i.e, a disparate treatment theory using comparators. *Wallace*, 271 F.3d at 221; *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Although the presumption of discrimination has disappeared, the trier of fact may consider evidence establishing the plaintiff's *prima facie* case and inferences drawn therefrom in determining whether the employer's explanation is pretextual. *Reeves*, 530 U.S. at 143. Coupled with the Plaintiff's *prima facie* case, for purposes of summary judgment the evidence of pretext usually will constitute sufficient evidence to raise an issue of material fact as to whether the employer's reason is credible or merely a pretext for discrimination or, if its reason is true, that a discriminatory reason more likely motivated the

-14-

decision to effect its adverse employment action.  *Reeves*, 530
U.S. at 143, 147-49.[5]  Sometimes, however, additional evidence
may be required.  *Id.*  "[T]he factfinder's rejection of the
employer's legitimate, nondiscriminatory reason for its action
does not *compel* judgment for the plaintiff.  The ultimate
question is whether the employer intentionally discriminated, and
proof that 'the employer's proffered reason is unpersuasive, or
even obviously contrived, does not necessarily establish that the
plaintiff's proffered reason is correct.'  In other words, '[i]t
is not enough . . . to *dis*believe the employer; the fact finder
must *believe* the plaintiff's explanation of intentional
discrimination.'"  *Id.* at 146-47 (emphasis in original), *citing*
*St. Mary's Honor Center*, 509 U.S. at 511, 524, 519.  "Whether
judgment as a matter of law is appropriate in any particular case
will depend on a number of factors.  Those include the strength
of the plaintiff's prima facie case, the probative value of the
proof that the employer's explanation is false and any other
evidence that supports the employer's case and that properly may
be considered on a motion for judgment as a matter of law."  *Id.*
at 148-49.

Alternatively, rather than demonstrating that the
defendant's articulated reason for its action is a pretext for
discrimination, the plaintiff may show that the defendant's
reason for the decision, while true, is only one reason for its

---

[5]  In *Reeves*, the Supreme Court found that the Fifth
Circuit panel "erred in proceeding from the premise that a
plaintiff must always introduce additional, independent evidence
of discrimination."  *Reeves*, 530 U.S. at 149.

conduct and another motivating factor is plaintiff's protected characteristic.[6] *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Pinkerton v. U.S. Dept. of Educ.*, 508 F.3d 207, 213 (5th Cir. 2007).

The analysis for a race discrimination claim under the TCHRA is generally the same as that under Title VII. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W. 3d 629, 633-34 (Tex. 2012)("Section 21.051 is effectively identical to its federal equivalent. . . Because one of the purposes of the TCHRA is to 'provide for execution of the policies of Title VII of the Civil Rights Act of 1964,' we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA.").[7] The Texas Commission on Human Rights Act ("TCHRA"), § 21.051 of the Texas Labor Code provides in relevant part, "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin or age the employer . . . discharges an

---

[6] The Fifth Circuit calls this the "modified *McDonnell Douglas*" approach. *Rachid*, 376 F.3d at 312.

[7] In enacting the TCHRA, the Texas Legislature intended to correlate "state law with federal law in the area of discrimination in employment." *Gold v. Exxon Corp.*, 960 S.W.2d 378, 380 (Tex. App.--Houston [14th Dist.] 1998, no writ). Thus the same burden-shifting framework used to analyze a case under the federal discrimination statutes applies under the Texas statute. *Id.* The case law developed under Title VII governs claims under the TCHRA. *Texas Dep't of Human Services v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995). TCHRA's express purpose is "the execution of the policies embodied in Title VII." *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991); Texas Labor Code Ann. § 21.001(1). Therefore courts interpret the TCHRA to be consistent with federal law. *Leatherwood v. Houston Post Co.*, 59 F.3d 533, 536 n.5 (5th Cir. 1995); *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996).

-16-

individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment . . . ."  The TCHRA applies only to "ultimate employment decisions", i.e., decisions involving hiring, granting leave, discharging, promoting, and compensating employees.  *Anderson v. Houston Community College System*, 458 S.W. 3d 633, 644 (Tex. App.--Houston [1st Dist.] 2015).  Under the TCHRA Mitchell need only prove that race was a "motivating factor for the employment decision.  Tex. Labor Code § 21.125(a).

### First Amended Complaint's Allegations (#7)

Mitchell, an African American and a veteran of the United States Armed Forces, was hired by Defendant Energy on February 7, 2012 to work in Houston, Texas as one of five new Pipeline Controllers, a highly regulated, safety-sensitive position which Defendant explains in Mitchell's case involved monitoring pipeline products moving through pipelines in Louisiana, New Mexico, and Texas and required special training and qualification.

Mitchell claims that on or about January 7, 2014 he was fired for events that occurred during his employment.  In July 2013 on a day he was not scheduled to work, Mitchell, wearing shorts and sunglasses, attended a team meeting at Defendant's offices.  A white Pipeline Controller (with the same job classification as Mitchell), subsequently identified as Charles Bozeman ("Bozeman"), also not on duty that day, like Mitchell came to the meeting in shorts.  Defendant reprimanded

both Pipeline Controllers orally and indicated it would issue a written reprimand shortly. Before the issuance of the written write-up, Mitchell went on a scheduled FMLA leave for treatment of a disabling condition in both his knees that arose during his military service. When Mitchell returned from FMLA leave, Defendant gave him a written reprimand not only for wearing shorts and sun glasses to the meeting, but for several other alleged incidents of poor job performance by Mitchell that had occurred before Mitchell took FMLA leave. When he complained of these additional incidents in the write-up, Defendant terminated him under the pretext that he had not signed his write-up form, but, according to Mitchell, actually based on discriminatory motives because of Mitchell's race. "The behavior, intentional acts and omissions of [Mitchell's] supervisors and co-worker lead directly to Plaintiff's discharge, as they intended, and were the direct and proximate cause of his legal injuries . . . ." #7 at ¶ 9. He claims that "Defendant unequally enforced its disciplinary policies and procedures on the basis of race/ethnicity/color. White American employees were treated leniently for serious work infractions, while Plaintiff was terminated for a minor work infraction." *Id.* at ¶ 11.

For example, Bozeman's write-up did not include matters of poor performance other than wearing sunglasses and shorts to the meeting, and he was not terminated even though he refused to sign his write-up form.

Other examples of discrimination in his workplace included a white employee of the same job classification as Mitchell who brought a firearm into the workplaces and was not reprimanded until months later when he complained about his compensation and another white employee who failed to come to work without providing an excuse to Defendant, but who was not terminated when he returned.

### Energy's Motion for Summary Judgment (#17)

With a very different version of what took place, Energy's motion for summary judgment asserts that shortly after receiving the written disciplinary action, Mitchell took more than four months of medical leave, several weeks more than his available FMLA leave.  Energy claims that during Mitchell's absence, his department "changed significantly," resulting in Mitchell having to re-train and re-qualify for his job upon his return.  Energy maintains that Mitchell refused to sign a document, titled "Corrective Action Form," presented to him describing the re-training, disputing both the length of the re-training and the need for him to re-qualify.  Although Mitchell was informed that the retraining program and the document describing it were not disciplinary, but were necessary because of changes in the equipment he operated, Mitchell still refused to sign and acknowledge that he would re-train and re-qualify. Instead he ripped the document up and gave the pieces to his supervisor and never reported to work again.  According to Human Resources Senior Manager Carrie Fowler's deposition testimony, after objecting to signing the form, Mitchell "made the decision

to leave" and voluntarily resigned. Ex. C, 82:5-13. Energy insists that there is no evidence of race discrimination and that Energy is entitled to summary judgment as a matter of law.

In greater detail, Energy explains that Mitchell worked in the Liquids Pipeline Control Center, which is "a central hub of controls which directed 'hundreds of thousands of miles of pipeline and numerous facilities such as valves, pump stations, [and] storage fields . . . spread across a large geographical area.'"[8] The special training and certification known as "Operator Qualification" ("OQ") are required before a Pipeline Controller can operate pipeline assets. Federal law, 49 C.F.R. § 195.505(b) and (e), requires that covered pipeline companies must "ensure through evaluation that individuals performing covered tasks are qualified" and "evaluate an individual if the operator [company] has reason to believe that the individual is no longer qualified to perform a covered task." Mitchell finished his initial training and qualification[9] on the pipeline assets in 2012.[10] Mitchell's job

_____

[8] Christopher Love, Manger of Pipeline Control, was Mitchell's supervisor. Love Dep., Ex. B, 18:10-13; 24:3-21.

[9] The training and certification, dubbed "Operator Qualification," is required before any Pipeline Controller can operate pipeline assets. Love Dep. at 43:9-14; 49 C.F.R. § 195.505 (Pipeline company must "ensure  through evaluation the individuals performing covered tasks are qualified" and "evaluate an individual if the operator [company] has reason to believe that the individual is no longer qualified to perform a covered task." Mitchell completed training and qualification on the pipeline assets in 2012. Love Dep. at 44:1-7, 44:12-17. *See also* 49 U.S.C. § 60102.

[10] Love Dep. at 44:1-7, 44:12-17.

duties included (1) monitoring various pipelines for
temperature, pressure, product flow rates, etc.; (2) using the
company's computers to operate pumps, valves, and other
facilities to commence or change the flow of liquids into
various pipelines, fractionation plants, and storage wells; and
(3) closely watching various pipelines, storage tanks, and other
equipment for leaks or other damage and to communicate with
other operators to ensure safe operation within standards and
regulations administered by the Pipeline and Hazardous Materials
Safety Administration ("PHMSA").[11]

     Love[12] was Mitchell's direct supervisor, and Steve
Chambers ("Chambers") was Love's immediate supervisor and
Director of Pipeline Control.  Love and Chambers hired Mitchell.
Ex. A, Freddie Mitchell Dep. at 63:14-23; Ex. B, Christopher
Love Dep. at 20:11-23.  Mitchell had no prior experience as a
Pipeline Controller.[13]

     On July 19, 2013, according to Energy, Mitchell took
part in a team meeting at Defendant's offices on a day on which
Mitchell claims he was not scheduled to work.  Mitchell parked
in the wrong parking lot despite earlier warnings not to, worked
in the Control Room with lights off although he was not supposed
to, and wore inappropriate attire (shorts and sunglasses) to the

---

[11] Love Decl., #17-4, Ex. D, ¶ 3.

[12] According to Love's Decl., Love is Senior Manager
Commercial Operations for Energy and Manager of Pipeline Control.

[13] Mitchell Dep. at 91:1-6.

team meeting, all of which Mitchell concedes.[14]  Another Pipeline
Controller, Bozeman, who was not on duty and who is Caucasian,
also attended the meeting wearing shorts.  Mitchell claims that
both men were verbally reprimanded and a written report was
prepared for each regarding their dress.  Energy states that the
written disciplinary warnings highlighted several instances of
unprofessional and problematic workplace conduct.

On July 19, 2013, after a number of incidents that
caused Energy concern about Mitchell's performance and
professionalism on the job, Love issued a written disciplinary
warning to Mitchell identifying those problems as Mitchell's
failure to adjust a valve properly, causing a flare of gas in the
pipeline, excessive and unscheduled absences, playing games on
his cell phone on the job, missing a critical communication for
a customer on the same day that he was verbally counseled for
playing cell phone games,[15] attending a meeting in shorts and
sunglasses, parking in the wrong parking lot despite warnings,
and working in the Control Room with lights off.  Bozeman
received a written warning on the same day, disciplining him for
working with the lights off in the Control Room, violating the
dress code at the meeting, and parking in the wrong lot.[16]  He was

---

[14] Mitchell Dep., Ex. 6 at 102:9-17, 108:6-10, 119:24-
120:4, 126:7-137:12, 130:7-131:19,

[15] These incidents of misconduct are documented in a
written warning issued by Love.  Mitchell Dep., Ex. E (July 19,
2013 Corrective Action Form, 115:13-24, 118:11-14).

[16] Ex. 7 (July 19, 2013 Bozeman Corrective Action Form),
136:22-137:9, 137:20-138:17.

not disciplined for excessive absences because, as Mitchell
stated, Bozeman "didn't have attendance issues"[17]; nor was he
reprimanded for playing cell phone games because according to
Mitchell, "he didn't do it" and "he wasn't on his phone."[18]  Nor
did Bozeman wear sunglasses.[19]  After Love discussed the written
warnings with both men, Mitchell signed his Corrective Action
Form, and Bozeman did not sign his.[20]

Mitchell went on medical leave on August 16, 2013 and
did not return until January 6, 2014.[21]  Energy gave him time off
under the FMLA and paid him for the company's short-term
disability program.[22]  After twelve weeks, Mitchell's FMLA leave
expired on November 8, 2012.[23]  Nevertheless he remained out on
unprotected leave for eight additional weeks with Energy's
approval, a short-term medical leave.  Although he was expected
to return on January 2, 2014, Mitchell called Love on that day
and said he would not be in because of child care needs, but
would return on January 6, 2014.[24]  When he returned on the 6th,
he brought a note from his physician stating that his late return

---

[17] *Id.* at 175:8-15.

[18] Love Dep. 46:18-47:5.

[19] Love Dep. 45:16-21; 78:25-79:4.

[20] Mitchell Dep., Ex. 6; Ex. 7, 134:1-3.

[21] *Id.* at 140:6-25; 147:6-12.

[22] Mitchell Dep., 141:1-6; 140:6-25; 144:11-23.

[23] *Id.*, 179:10-20; 146:6-3; see also Dep. of Carrie Fowler, Ex. C, 58:1-5; 72:8-21.

[24] Mitchell Dep., 147:6-12; 148:2-25; 145:11-16.

-23-

was medically necessary, although Mitchell now concedes that the extra time was completely unrelated to his knee procedure.[25]

Mitchell was the only Pipeline Controller to take such a long leave of absence; one other employee, Steven Summers, took a three-week leave.[26]  In Mitchell's absence, especially the longer it continued, several pipelines and station locations were re-programmed, a new connector was installed, and systems were integrated.[27]  Concerned that Mitchell would not know how to perform his job duties with the changes and that Mitchell's previous performance problems would continue, especially since Mitchell took leave before demonstrating improvements in his performance, Love consulted with Human Resources Senior Manager, Carrie Fowler how to proceed.[28]  Love and Steve Chambers, Director of Pipeline Control, with Fowler, developed a policy requiring re-training and re-qualification of any Pipeline Controller returning from a leave longer than six months and planned that it would apply to Mitchell on his return.[29]  Love called Mitchell to

---

[25] *Id.* at 148:2-25; 145:11-16.

[26] Love Dep. 114:16-115:14; Mitchell Dep., Ex. 9.

[27] Fowler Dep., 78:13-79:9; Mitchell Dep., Ex. 9.

[28] Love Decl. Ex. 9, ¶ 9.

[29] Love Decl. ¶¶ 7-9; Fowler Dep. at 75:3-10; Mitchell Dep. Ex. 9; Love Dep. 112:11-20, 113:14-23.  Prior to 10/22/12 there was no written policy or procedure in place that required an operator coming from leave to be re-trained and/or re-qualified. Fowler Dep., Ex. C at 74:17-75:1; 81:1-20.  Love, Chambers, and Fowler required Mitchell to sign the document to acknowledge the new policy requirement and to reinforce the expectation that the concerns be corrected.  Love Dep. 131:12-20, 118:25-119:22; Fowler Dep. 44:14-45:7, 78:13-79:9, 85:10-14; Mitchell Dep. 149:11-21.

tell him that he would need to re-train because of the changes, but also that Love did not agree with the requirement to re-qualify.[30]   During his deposition, Mitchell stated that in his "experience" he did not believe the requirement was an "industry standard," but admitted that he had no prior experience as a Pipeline Controller with any other company.[31]

When he was presented with the Corrective Action form on his return to work on January 6, 2014, Mitchell saw it as restarting his prior discipline or "starting a new corrective action" and as a "form of trickery."[32]

The next day Mitchell spoke to Fowler, who told him he could write any concerns on the form, but that he was required to acknowledge that it was discussed with him, that his signature was required because he would be re-training and re-qualifying, and that if he chose not to sign it, he would no longer be an employee.   Fowler Dep. 83:7-10, 85:10-14; Mitchell Dep. 167:16-168:19, 169:3-10.   Mitchell decided against signing "on principle," returned the form, ripped in half and folded a number of times, to Love on January 7, 2014, left the workplace, and did not return.   Mitchell Dep. 169:3-10, 172:9-20.

---

[30] Mitchell Dep. 149:11-21. 151:22-152:10, 152:11-22, 153:17-155:3.

[31] Mitchell Dep., 155:20-156:5; 157:8-21.

[32] *Id.,* 160:21-161:13, 163:19-164:6.

Mitchell never complained to anyone at Energy that he believed he was being treated unfairly due to his race or because he took an FMLA leave of absence.[33]

Since Mitchell has no direct evidence of racial discrimination, the *McDonnell Douglas* burden shifting framework applies to his claim.  Energy insists that Mitchell has failed to and cannot present a *prima facie* case of race discrimination because he has no evidence that he suffered an adverse employment action or that he was treated less favorably than any similarly situated employee outside his protected class.  "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004), *quoting Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003).  Disciplinary write-ups are not adverse employment actions.  *Carthon v. Johnson Controls, Inc.*, No. 03-31106, 100 Fed. Appx. 993, 997 (5th Cir. June 21, 2004)(*per curiam*)("receiving formal discipline" is not an "ultimate employment decision").  Energy insists that Mitchell's employment was not terminated and that Mitchell has not produced any evidence that his employment would have ended even if he had signed the agreement to complete re-qualification.  Although this was the first time they required a Controller to re-train and re-qualify following an absence, Chambers and Love agreed that "any Liquids Controller missing 6 weeks or more of Control Center time

---

[33] Mitchell Dep. 96:5-11,

will need to be retrained and re-OQ'd.[34]"  Ex. 9 to Mitchell's
Dep., #17-1, 113:14-23.  Fowler Dep. 74:17-75:2 (prior to October
2013, no policy in place required re-training or re-
qualification).  Mitchell concedes that he understood his
continued employment was conditioned on his signing the form,
which he chose not to do.[35]  The requirement that Mitchell sign
the form upon his return to work does not amount to an adverse
employment action even if the form included a reminder of his
earlier performance deficiencies.  *Kinsey v. City of
Jacksonville*, No. 3:01 CV 785 J 32MCR, 2005 WL 3307211, *7 (M.D.
Fla. Dec. 6, 2005), *aff'd*, 189 Fed. Appx. 860 (11th Cir. July 3,
2006)(requiring plaintiff's signature to acknowledge receipt of
reprimand form not an adverse action under Title VII).  Mitchell
has not identified any tangible, negative impact on his
employment related to the form Defendant required him to sign.
He has admitted that both Love and Fowler told him the form was
not disciplinary, but he chose not to believe them.[36]  He was also
told a number of times that his signature was merely to show that
he received and understood the re-training and re-qualification
requirement.[37]  *See Cochise v. Salazar,* 601 F. Supp. 2d 196, 201
(D.D.C. Mar. 7, 2009), *aff'd*, 377 Fed. Appx. 29 (D.C. Cir. May
24, 2010)("Neither letters of counseling that contain job-related

---

[34] "OQ" stands for Operator Qualification.

[35] Mitchell Dep., 169:3-10

[36] Mitchell Dep. 162:8-13, 163:19-164:6.

[37] Love Dep. 127:7-22, 136:3-15; Fowler Dep. 83:7-10.

constructive criticism . . . nor warnings without attendant effects on employment . . . are materially adverse employment actions."). Even though Mitchell's case was the first time Energy chose to require a signature on a Corrective Action Form,[38] the record shows that he was repeatedly told there would be no negative consequences for signing the form, but that his signature was merely an acknowledgment that he received the re-training and re-qualification information; that he personally objected to such requirement and did not believe his supervisors' assurances does not create a genuine issue of material fact. *Baird v. Gotbaum*, 744 F. Supp. 2d 279, 291 (D.D.C. 2010)(even though requirement for signature on policy acknowledgment was "unprecedented" and led plaintiff to believe she was being "singled out," requirement was not an adverse action)(*citing Kinsey* for rule that requiring signature to acknowledge receipt is not an adverse action), *aff'd in part and vacated on other grounds in part*, 662 F.3d 1246 (D.C. Cir. 2011), *remanding* hostile work environment claim, 888 F. Supp.2d 63 (D.D.C. 2012), *aff'g* dismissal of hostile work environment claim, 792 F.3d 166 (D.C. Cir. 2015).

Furthermore Mitchell's claim that he was unfairly disciplined is not sufficient to constitute an employment action. *se DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 442, No. 05-21087, 2007 WL 126081 at *3 (5th Cir. Jan.

---

[38] Love explained that he used the company's Corrective Action Form template for Mitchell's signature because it was the "only template provided for documented communications with an employee."  Love Dep., 132:4-10.

19, 2007)(written warning to employee for insubordination, being argumentative, and excessive absenteeism was insufficient to dissuade a reasonable employee from making or supporting a charge of discrimination); *Hernandez v. Johnson*, 514 Fed. Cir. 492, 499, No. 12-50338, 2013 WL 657697 at *6 (5th Cir. Feb. 22, 2013)(letter of counseling and record of infractions without evidence of pretext did not constitute materially adverse employment action under *Burlington Northern* to support employee's Title VII retaliatory employment discrimination claim). Although Mitchell was coached and instructed by his supervisors, these ordinary employment actions did not cause any negative consequences for his status as an employee, and therefore Mitchell cannot assert that his supervisor's warnings affected his job duties, compensation, or benefits.

Mitchell also cannot argue that he was constructively discharged, i.e., that his working conditions were so intolerable that any reasonable employee would feel compelled to resign. *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). "'An employee's obligation of reasonableness requires that [he] not jump to conclusions and assume the worst.'" *Thompson v. Naphcare, Inc.*, 117 Fed. Appx. 317, 324 (5th Cir. Nov. 11, 2004)("Whether a reasonable employee would feel compelled to resign depends on the circumstances with special consideration, *inter alia*, of seven non-exclusive factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or

humiliation by the employer circulated to encourage the employee's resignation; and (7) offers of continued employment on terms less favorable than the employee's former status."), *citing Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5th Cir. 1987).   The record shows that Mitchell jumped to the conclusion that he was constructively discharged.

Energy further points out that it is entitled to the "same actor" inference because the same actor who hired Mitchell, i.e., Love, later discharged him, allegedly because of racial animus.   "The same actor inference creates a presumption that animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue."   *Spears v. Patterson UTI Drilling Co.*, 337 Fed Appx. 416, 421-22 (5th Cir. July 16, 2009); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996)(the "same actor doctrine" reasons that "from the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job"); *Howard v. UPS, Inc.*, No. 3:09-CV-2074-K, 2011 WL 195682, at *6-7 (N.D. Tex. Jan. 18, 2011)(same-actor inference applies to both retaliation and discrimination claims); *Raggio v. Parkland Memorial Hospital*, Civ. A. No. 3-95-CV-0680-R, 1997 WL 135662, at *5 (N.D. Tex. March 12, 1997)(where same-actor inference applies, plaintiff must submit substantial evidence of 'sufficiently egregious facts' to overcome the inference that Defendants' stated reason for discharging plaintiff was not pretext for discrimination").   Energy maintains that Mitchell has not presented any evidence, no

less "sufficiently egregious" evidence, to suggest that Love, who hired Mitchell, suddenly developed a racial bias against him; Nor can Mitchell produce evidence that he suffered an adverse employment action.  Thus he cannot meet this element of his *prima facie* case.

Nor has Mitchell demonstrated that any similarly situated employee outside his protected class was treated more favorably.  A similarly situated employee must hold the same job, title, and duties, under the same supervisor, commit the same infractions, and not be discharged.  *Mack v. John L. Wortham & Son*, 541 Fed. Appx. 348, 359 (5th Cir. Sept. 5, 2013), *citing Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995); *Okoye v. Univ. of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001)(where other employees' violations differed from and were less serious than those committed by the plaintiff, the plaintiff failed to establish disparate treatment).

Energy argues that Mitchell has not raised any genuine issues of material fact to show he was similarly situated to Bozeman.  The parties agree that Bozeman refused to sign his July 2013 corrective action notice and was sill permitted to continue his employment at Energy.  Nevertheless Bozeman's corrective action notice did not involve a re-training or re-qualifying requirement, which was the only reason why Mitchell was required to sign his January 2014 form.[39]  Bozeman did not commit the same

---

[39] Mitchell Dep. 174:16-19 (agreeing that the corrective action Bozeman refused to sign did not require that he re-train or

infractions as Mitchell because he did not refuse to sign a re-training and re-qualification requirement. *Mack*, 541 Fed. Appx. at 360 (affirming grant of summary judgment to employer where employee "failed to present evidence that other employees were similarly insubordinate"); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 252, 259 (5th Cir. 2009)("[W]e require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken under nearly identical circumstances.").

Nor has Mitchell shown that Steven Summers, the coworker who purportedly brought a weapon to work and was not punished, was similarly situated to Mitchell, who never brought a weapon to work. Mitchell Dep. 200:2-3, 201:20-23.

Even if Mitchell could demonstrate a *prima facie* case, Energy has provided a legitimate, nondiscriminatory reason for his alleged termination, i.e., that he refused to sign the form acknowledging the necessary re-training and re-qualification for his position. Federal law required Energy to "evaluate [Mitchell if it] had reason to believe that [Mitchell was] no longer qualified to perform a covered task." 49 C.F.R. § 195.505. Love, Chambers, and Fowler agreed that re-qualification would be

---

re-qualify). *See also* Love Dep. 131:12-20 (Mitchell required to sign because the form included an expectation that he re-train and re-qualify), 136:3-15 (verbal commitment was insufficient to agree to re-train). Fowler Dep. 44:14-45:7 (discussed with Love, Chambers and legal counsel and determined that because of the re-training requirement, Mitchell should be required to acknowledge the form), 78:13-79:9 (purpose of the form was for Mitchell to acknowledge his need for re-training and re-qualifying), 85:10-14 (requirement to sign the form was based on the fact that Mitchell was going to need to re-train and re-qualify).

necessary and that a signature would be required because Energy needed to record that Mitchell received the re-training and re-qualification requirement.  Thus the burden of persuasion shifted to Mitchell to demonstrate that Energy's stated reason for his discharge was false and pretextual and that Energy was motivated by discrimination.

Energy contends that Mitchell fails to satisfy that burden.  As discussed, the record reflects agreement by Love, Chambers, and Fowler that a written document was required to establish that Mitchell actually received the form describing the re-training and re-qualification requirements.  Love additionally wanted to reiterate in writing the performance concerns of Energy that Mitchell had not yet addressed.  Although Mitchell may disagree with the decision, he has not presented any evidence demonstrating that the rationale behind the requirement was not genuine.  *Mayberry v. Vought Aircraft*, 55 F.3d 1086, 1091 (5th Cir. 1995)("The question is not whether an employer made an erroneous decision; it is whether the decision was made with a discriminatory motive.  Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason."); *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1991)("[D]iscrimination laws [are not] vehicles for judicial second-guessing of business decisions.").

Mitchell has not provided any evidence that Energy was motivated by racial discrimination when it required Mitchell's signature or re-training and re-qualification.  The new policy,

supported by 49 C.F.R. § 195.505, was developed with the
intention that it would apply to any Liquids Controller in a
similar situation, missing six weeks or more of work.  Mitchell
has not shown that this rationale is pretextual.  Given the
undisputed facts here, Energy was reasonable in presuming that
Mitchell chose to end his employment with Energy rather than
complete the re-qualification requirement with which he
disagreed.

### Mitchell's Opposition (#19)

After carefully reviewing Mitchell's opposition and
Energy's reply (#21), in addition to Energy's motion, the Court
finds that while Mitchell has raised genuine issues of material
fact for trial regarding whether Bozeman was similarly situated
to Mitchell, whether Mitchell was treated differently from the
way Energy treated Bozeman, whether Energy's officers created an
ex post facto policy and applied it only to Mitchell when he
allegedly violated its rules, and whether he was fired for
objecting to and refusing to comply with that ex post facto
policy.  Nevertheless, Mitchell has failed to prove a key element
of his cause of action, i.e., that the alleged discriminatory
treatment of him was based on his race.

Mitchell makes a sufficient case that he and Bozeman
were "similarly situated" to raise  genuine issue of material
fact for a jury.  Mitchell was hired by Energy as a Pipeline
Controller in February 2012, with Bozeman hired shortly after
with the same title. #19-5, ¶4, Mitchell Affid.; Love Dep. #19-
2, 37:8-2 ("My recollection is that Mr. Bozeman was hired

multiple months after Mr. Mitchell.  Mr. Mitchell, as I recall,
was hired in February of 2012, and my recollection is that Mr.
Bozeman was hired some months after that point in time.").
Mitchell's affidavit states, "Charles and I were paired together
and worked as partners for Energy Transfer.  We had the same job
duties, responsibilities, worked for the same shifts and both
worked in the Liquid Pipeline Control Center . . . at the same
times on the same days."  *Id.* at ¶ 5.  In completely denying
Energy's objections to and motion to strike Plaintiff's evidence
(#20), United States Magistrate Judge Frances Stacy noted, "Such
a work pairing and/or working relationship provides a reasonable
and sufficient basis for Plaintiff to have personal knowledge of
Bozeman's schedule, work duties/responsibilities, and his
response to disciplinary infractions asserted by Defendant." #24
at ¶ 1.  Both Controllers were supervised by Christopher Love,
who, in turn, was supervised by Steven Chambers.  #19-5, ¶ 6.  On
July 18, 2012, both Controllers had the day off and appeared at
the team meeting in inappropriate attire, with Mitchell wearing
shorts and sunglasses and Bozeman wearing shorts, and both were
issued Corrective Action Forms by Love for behaviors allegedly
violating company dress policy.  *Id.* ¶¶ 8-11.  #19-6, Mitchell's
July 19, 2013 Corrective Action Form; #19-7, Bozeman's July 19,
2013 Corrective Action Form.  Both Forms addressed not only their
inappropriate attire at the July 18, 2013 meeting during working
hours, but other instances of identical misconduct on the same
dates and at the same times:  both were criticized for parking in
the "711 Louisiana underground garage in violation of a policy

-35-

that had been communicated to the Pipeline Control Group multiple times via e-mail" on May 10, 2013; and on July 9 and 10, 2013 the two "operated in the Control Center with the lights turned off on the Liquids side of the room, a violation of Energy Transfer's Control Room Management Plan."[40]   In addition to these examples of identical mutual misbehavior, Mitchell's Form targeted his playing a game on his personal cell phone for over twenty minutes on July 11, 2013, his excessive absences, his failure to follow established procedures in requesting time off and timecard completion, and, vaguely, "issues where mistakes were made or critical issues were overlooked."   #19-6.   Bozeman's Form addressed "the frequency and duration of breaks that he was taking from the Control Center, leaving the building by vehicle for food while on shift, and "openly and defiantly questioning the instruction" regarding the Control Center lights turned off "in the presence of other Controllers."   #19-7.   In addition, Love's notes, included in his supervisory file, #19-8, 7/11/13 entry, state that Mitchell and Bozeman "missed the fact that communications were out to [the Conoco Phillips Sweeney Facility] and failed to flow balance the line hourly for leak detection from 3:05 a.m. through 8:10 a.m."   As noted, "Applied to the broader circumstances of a plaintiff's employment and that of his proffered comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the

---

[40] The quotations are from Mitchell's Form, but the same examples are found in Bozeman's.

situations of two employees would be totally identical. . . .
Each employee's track record at the company need not comprise the
identical number of identical infractions, albeit these records
must be comparable." *Lee*, 574 F.3d at 261.  Mitchell has
asserted sufficient instances to raise a fact issue regarding
whether he and Bozeman are similarly situated.

        To support his claim of discrimination, Mitchell
highlights Defendant's different treatments of Mitchell and
Bozeman for nearly identical misconduct.  While both Controllers
were criticized for inappropriate attire, Mitchell's Form
included "the inflammatory personal commentary" that Mitchell's
dress should be construed as "showing a lack of respect and
compliance towards established policies." #19-6.  Yet despite
Love's criticism of Bozeman's "openly and defiantly questioning"
the instruction regarding the lights in the presence of other
Controllers, Love merely stated that Bozeman should "be more
cooperative." #19-7.  Furthermore Mitchell signed his July 19,
2013 Corrective Action[41] Form (#19-6), while in contrast Bozeman
did not, because Bozeman "does not agree with the issue of the
lights in the Control Center or with the issue of wearing shorts
to the team meeting," according to a note by Love on the
document. #19-7.  Yet while Mitchell was subsequently terminated
for his refusal six months later to sign his second Corrective
Action Form of January 6, 2014 (#19-11), based on the same events

---

[41] In his affidavit Mitchell averred, "It was not fair
for me to be disciplined twice for the same conduct.  So I refused
to sign the Corrective Action Form with the disciplinary language
written into it." #19-5 ¶ 21.

and circumstance underlying his July 19, 2013 Form which he had signed, Bozeman was not terminated for his refusal to sign, but allowed to continue working for Energy and was promoted within the organization. #19-5 ¶¶ 14-16, 32. When Mitchell objected to signing the second Form dated January 6, 2014 (#19-11) based on the same events as his previous Form, he was told he would be terminated if he did not do so: "sign the corrective action form or you will be terminated." #19-10, CD of Audio Recordings January 7-8, 2014. Although Energy claims that Mitchell voluntarily resigned, Energy's internal documents include communications among its employees involved in Mitchell's termination, expressly using the term "termination." #19-11, e-mails authored by Energy employees, Jan. 8-9, 2014. Moreover, Fowler told Mitchell that she and Chambers were forcing him to sign because of a company policy; when he asked to see a copy, none was provided and he subsequently learned that no such policy existed at the time. #19-5 ¶¶ 33-34; Fowler Dep., #19-14, 4:13-19 (stating that there was no written policy requiring employees to sign corrective action forms before July 2012, nor in January of 2014).

   While Mitchell jumps to the conclusion that because he is African American and Bozeman, Love, Chambers, and Fowler are Caucasian, Energy's discriminatory treatment of him is motivated by racial animus, he fails to present any supporting evidence for such. During his deposition (#17-1, 136:5-19), Mitchell was asked if the second Corrective Action Form was given to him because of his race:

```
A.  Yes.
Q.  Why do you believe that?
A.  I just do.
Q.  Is there any basis for that opinion, or is that
just your belief?
A.  That's my belief because, like I said, in the
second write-up, I didn't sign it.
Q.  Any other reason why you believe this write-up was
given to you because of your race?
A.  No, not exactly.
```

Mitchell's alleged termination could just as easily have been based not only Energy's claimed reason, his failure to sign the second Corrective Action Form, but on personality conflicts, his patently excessive absences, any of his other alleged performance deficiencies, or any number of other reasons. Love's notes (#19-12) state that he and Chambers first developed the re-training and re-qualification plan for Mitchell because of the "amount of time away from the Control Center," more than any other Energy employee ever had done, as well as "significant changes" in their pipeline operations during his extensive absence.[42]  Ashleigh Johnson in the OQ/Training Department and Fowler in the Human Resources Department subsequently approved the new plan.  Moreover since Love both hired and fired Mitchell, the same actor inference appears particularly applicable here and creates a presumption that racial animus toward Mitchell was not a factor in his termination.  Mitchell has not rebutted that presumption.

---

[42] Love's notes state, "While this is the first situation we have faced of an extended absence [2.5 months, 12 weeks] since the inception of the NGL Liquids Pipeline Control Center, Steve and I agree that any Liquids Controller missing 6 weeks or more of Control Center time will need to be retrained and re-OQ'd."  #19-12.

Accordingly, given Mitchell's statement that he was no longer pursuing his FMLA claims, the Court

ORDERS that Mitchell's claims under the FMLA are DISMISSED with prejudice.   Because Mitchell has failed to meet his burden of proof to establish a nexus between the employment action taken by Energy and Mitchell's race, the Court further

ORDERS that Energy's motion for summary judgment (#17) is GRANTED.   A final judgment will issue by separate document.

SIGNED at Houston, Texas, this  9rd  day of  February , 2017.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE